Peck, J.,
dissenting:
I concur with the majority of the court in the conclusion stated in the opinion of the Chief Justice in so far as it has reference to the vessel Einilie. I dissent from so much thereof as has reference to the vessel Eebecca Clyde. I dissent from nearly all the positions assumed in the opinion of the Chief Justice just read, and shall state briefly the views I entertain in this case, reserving to myself the privilege of stating my opinions more at length in some one of the other cases germane to this now under advisement by the court.
The Quartermaster General states as follows. I copy from his letter of the 6th of February, 1869, to the Secretary of War:
“ General : I have the honor to return, herewith, communications from the Court of Claims, dated December 15 and 30, 1868, and February 1st, 1869, requesting evidence in the claim of Thomas Clyde, esq., owner of the steamers Eebecca Clyde and Emilie, which have been referred to the Quartermaster General for report.
“ I have the honor to state that the steamer Eebecca Clyde was chartered on the 26th of October, 1863, by Captain A. Boyd, assistant quartermaster United States Army, at Philadelphia, from Thomas Clyde, at the rate of $300 per diem, and remained in service under this charter until February 23,1864, when she was discharged.
u On the 19th December, 1863, Captain Boyd was informed by this office that ‘ the rate of this vessel, if her services are required for a longer period, is deemed excessive, and will be reduced from the 20th December, 1863.’
“ Captain Boyd, it appears, notified Mr. Clyde of the proposed reduction, who, under date of December 23, 1863, agreed to reduce the rate to $200 per day.
*156 “ Payment bas been, made to the claimant for services of the Eebecca Clyde as follows :
“ From October 26,1863, to November 24,1863 — 29f days, a $300 per day. $8, 925 06
“ From November 25,1863, to 12 m. January 2, 1864, being 25 days a $300 per day. 7,500 00
2,700 00 “ 13 J days, a $200 per day
“And from 12 m. January 2, 1864, to 12 m. February 23, 1864, 52 days, a $200 per day. 10,400 00
“Total. 29,525 00
“ The owner now claims additional pay from December 20, 1863, to February 23,1864, 12 m., being 65J days, at $100 per day, being the difference between $300, the charter rate, and $200, the reduced rate, amounting to $6,500 50, which the Quartermaster General recommends be disallowed, the owner having agreed to the reduction of pay, which was ample remuneration for a vessel of her class. Attention is respectfully invited to the accompanying copies of charters of this vessel, dated May 29,1864, and February 22,1865, at the rate of $200 per day; and also to letters of Captain E. T. Allen, assistant quartermaster, and C. D. Ashcroft, dated, respectively, September 27,1864, and May 10,1865, from which it will be seen that Mr. Clyde offered his vessel to the government, and was anxious to secure her employment after the expiration of the first charter, for $200 per day.”
The statement of this letter, that claimant, on the 23d December, 1863, agreed to reduce the rate of the vessel to $200 per day, is not sustained by any proof. If the Quartermaster General knew the fact to be so, he should have been sworn as a witness to prove it. His bare assertion, however correct it may be, is not evidence. The claimant objected to this letter as evidence, and I think his objection was well taken. The Quartermaster General, in the concluding part of his letter, states what is fair to presume was his only information about that fact, viz., that the claimant offered his vessel at a later period at $200 per day. From this uncertain data and inconclusive reason, he (and the majority of the court seem to agree with him) believes that this is satisfactory evidence that the claimant, by making the proposition referred to, did consent to a reduction.
*157 If this letter is to be considered as good evidence of one fact, it must be equally good for another. Suppose we refer to the second paragraph of the letter, which admits that the Eebecca Clyde was chartered at the rate of $300 per day, and remained i'll service under the charter until February 23,1864, for another fact, and then see how little ground there is for contesting this claim. The letter, being all about the same subject, must be taken as good in all its parts, if taken at all. The first admission is derived from the papers in his own custody, and should have far greater weight than the second statement.
I shall now show from the record what the proposition made by the claimant was, and upon what terms and conditions the claimant proposed or consented to reduce the rate of hire of his vessel.
On the 19th of December, 1863, E. E. Clary, Colonel and Quartermaster, wrote to Captain Boyd, Assistant Quartermaster United States Army, as follows:
“Captain : The accounts of the following named vessels are referred to you for payment, in accordance with the evidences of service and remarks herewith, viz:” * * * *
“ Steamer Eebecca Clyde from 6 a. m., October 26, 1863, to November 24, 1863=29| days, at $300 per day=$8,925.
“ The rate of this vessel, if her services are required for a longer period, is deemed excessive, and will be reduced from the 20th December, 1863.”
It nowhere appears that the intention of the defendants to reduce the price was directly communicated to the claimant, but it may be inferred from the following letter that it was. The claimant, after insisting that the vessel was worth the price agreed upon by the charter-party, consents to a reduction if the defendants will also agree to' new conditions and ■terms, but not otherwise:
“Philadelphia, December 23,1863.
“Dear Sir: Your note in reference to reducing the charter of the steamship Eebecca Clyde received.
“ In reply, I would say that lam always willing to charter my steamers to the government at the lowest rates, but I am satisfied that this new steamship is not known to the government. She made the first trip to Hilton Head in seventy-two, and the second in fifty-six hours. She is a full double-deck *158 ship, with ample carrying capacity, superior accommodations, great power and speed, and draws, loaded, but nine feet of water. Her present charter ($300 per day) is reasonable, but as she was built expressly for the New York and Richmond trade, if the government loill keep her for four months, or till that port is open, I will reduce her to $200 per day from the 20th of this month.
“Yours, respectfully,
“THOS. CLYDE.
“ Captain A. Boyd,
“ Assistant Quartermaster.”
Whether these new terms were ever communicated to the Quartermaster General is not shown, but Colonel E. E. Clary writes the following letter to the same Captain Boyd:
“ Quartermaster General’s Oeeice,
“ Washington, JD. G., January 4, 1864.
“ Captain : It is not known by the department that necessity exists for retaining the steamer Rebecca Clyde in the service. Should she be required, and you cau afford her constant employment, you can retain her at the rate authorized by the letter from this office of the 19th December; otherwise she should be at once discharged.
“ Very respectfully, your obedient servant,
“By order,
“B. E. CLAEY,
“ Colonel and Quartermaster.
“ Captain A. Boyd,

“Assistant Quartermaster, Philadelphia, Pa.”

No rate of hire for the vessel was authorized by the letter of the 19th December, 1863. Nor is a word here stated as to the conditions upon which alone the claimant consented to a reduction. But Colonel Clary directs that the vessel, if needed, should be retained at the price arbitrarily fixed by the defendants, without regard to the conditions offered by the claimant.
That the vessel was not discharged until some days after the 5 th of January, is shown by the following admission and letter:
“Assistant Quartermaster General’s Oeeice,
“ Philadelphia, January 5,1864.
“General: I have the honor to state, in reply to your letter of the 4th instant, that the steamer Rebecca Clyde was char *159 tered to make two trips to Morris Island with conscripts from this city. On the second trip she was retained there for service in the department. Had she returned, it was my intention to• have discharged her.
“ Yery respectfully, your obedient servant,
“A. BOYD,
“ Captain and Assistant Quartermaster.
“Brigadier General M. 0. Meigs,
“ Quartermaster General O'. 8. A., Washington, B. CJ
There are two letters in the record of the 5th of January,, 1864. I give copies of both, for they do not change the facts of the case. No answer was given to either letter, nor does it appear that the conditions making a part of the offer to reduce the price were stated by Captain Boyd. Whether they were or not does not make any change in the law of the case so far as the-, claimant was concerned. It is not shown that he ever saw or heard of either of the letters. Without that fact established,, two quartermasters, by correspondence between themselves,, could not change, suspend, or destroy his contract.
“Assistant Quartermaster General’s Oeeice,
“ Philadelphia, January 5, 1864.
“ General : I have the honor to state, in reply to your letter of the 4th instant, that the steamer Bebecca Clyde was chartered to make two trips to Morris Island with conscripts from this city. On the second trip she was retained there for-service in the department. Had she returned it was my intention to have discharged her.
“ I informed you, under date of 23d ultimo, that Mr. Clyde,, her owner, had consented to a reduction in her rate of pay from $300 to $200 per day, from the 20th December, 1863.
“Your letter of 19th ultimo directs a reduction of her pay,, but fixes no rate. Is $200 per day satisfactory %
“Yery respectfully, your obedient servant,
“A. BOYD,
“ Captain and Assistant Quartermaster.
“Brigadier General M. C. Meigs,
“ Quartermaster General O. 8. A., Washington, B. C.n
The vessel was discharged on the 23d of February, 1864. *160 As sbe was only paid lier charter rates, notwithstanding what "the Quartermaster General states, up to the 20th December, 1863, and thenceforward was only paid $200 per day until her discharge, there remains due to the claimant the sum of $100 per day, for the time between the 20th of December, 1863, and “the date of her discharge, which I think the claimant should recover.
I leave the second charter-party out of the question. The claimant had a right to stand upon the first until his vessel was nither discharged or until a new bargain had been made by the •consent of both parties.
The defendant could not, except by duress, retain the rmssel for a single day upon any other terms than were consented to by the claimant.
No unaccepted proposition to modify the contract could operate to suspend it, unless the suspension was apart of the proposition, which was not the case. Until the modification proposed became absolute by acceptance of its terms the contract retained its original vigor.
The claimant remaining in doubt about the acceptance of his proposition, sought and obtained the discharge of his vessel rather than continue her in service upon uncertainties as to time and compensation. It seems to me that no conclusion from this fact can be drawn against the right of claimant to recover. He sought by this means to avoid controversy. The defendant would not say yea or nay to his offer, and he could not conjecture how long or how short a time his vessel might be retained.
Next in order of discussion are the two receipts, each “in full of the above account.”' The accounts so receipted state the number of days which the vessel had rendered service, and the ■compensation paid for those days, which was $100 per day less than that fixed by the contract. That the service was rendered the receipts and certificates accompanying them fully show. The claimant had fully performed all his obligations, as he shows, for without that he could not receive even payment- on account. This places all dispute and controversy as to the sum. due out of the case.
The receipts were in the ordinary form, furnished and prescribed by the defendant, who, doubtless, prepared them $ they were not under seal and do not purport to be in full of all de- *161 mancls for tlie service rendered. They are only in full of tlie amount wbicli the defendant then chose to pay.
It has been long recognized as a settled principle “that the discharge of an obligation by an ordinary writing is of no legal efficacy, merely considered in itself; a receipt for a sum of money is only evidence of the act of payment;” it is open to contradiction and has no immediate intrinsic operation in producing a discharge. (Evans Potliier on Obligations, vol. 2, page 141.)
That the claimant was willing to receive partial payments may well be inferred from the fact that he had, by his charter-party of the vessel, agreed to pay all the current expenses of the officers and men who managed her, besides keeping her in repair. This created a necessity for money, and he only did as all others have done or would do under like circumstances. It is the common course of business, followed by a very large majority of men in the ordinary transactions of life. The contract was to pay the vessel a per diem for her services; and unless the argument of inconvenience is adopted, or that of custom, or a resort to the mutual understanding of the parties is had, (the latter of which the court rejects in this case,) the inference would be that the claimant should be paid as often, at least, as he came to a port where payment could be made.
In Pratt’s Case, (3 C. Cls. R., p. 105,) this court unanimously held, that a receipt precisely like those in this record “ does not bar or estop this claimant from further recovery upon his contract.” I will only refer to a few of the other decisions heretofore made by this court, after much deliberation and discussion, where the same principle is sustained. I refer only to the following, viz: Theodore Adams, (2 C. Cls. R., p. 70,) Mowry’s Case, (p. 68,) Reeside’s Case, (pages 55, 56, 57, 58, 59, 60, 61;) Ramsdell & Smith’s Case, (p. 508;) all in the same volume. There seems to me to be a lamentable want of respect in this court for its own decisions.
All that is said about protests in Pratt’s case was said as make-weight, to show the injustice of the action of the Quartermaster’s Department toward Pratt. It was not, nor was it made, the turning-point in the case. No protest is necessary to entitle a party to recover what is due him, under a contract, nor can acquiescence be inferred from an omission to protest. It is not to be presumed against a party, that he relinquishes his rights under a contract, because he receives partial pay- *162 meats .Avithout protesting on every occasion, when he accepts money on account. Much less can it be presumed from such conduct that his contract has been suspended or altered, or that a new one has been made. The party who alleges the change must show mutual consent thereto. The contract stands unless the party asserting the change proves it. Was a protest necessary, in order to notify the quartermaster that 200 was not the equivalent of 300® Was it necessary, in that way, to inform him that he was not paying the full price fixed by the charter-party ? The United States could not suffer loss by an omission to protest; the money was in their custody and was kept there, and no other person than the claimant had any pretense of right to it. The defendant could not suffer damage by reason of any want of notice, and that is all a protest could avail.
The claimant protests against the action of the defendant in withholding his money, by bringing this action within the proper time. He has brought his suit within six years, the only limitation which the law fixes. This court has not the power to make a different limitation from that named by Congress; and no argument can fairly be drawn against the rights of a party, because he does not prosecute his claim sooner than the act of Congress requires.
The right of revision, reserved by the charter-party to the Quartermaster General, should have been exercised, if at all, the vessel being in his service, within a reasonable time, but it was not. No complaint of the charter-party was made until nearly two months after the vessel was in service — a length of time which could not have been anticipated. When the objection was at length made, it was not by the Quartermaster General, to whom alone the right of revision was given, but by his subordinates, who had no authority in the premises. The claimant had a right to infer from this long acquiescence that no objection would be taken to the price or terms of the contract.
There is no magic about a charter-party, which requires or justifies any deviation from settled rules of law, to comprehend its force or explain its meaning. It is to be construed, not by the arts of legerdemain, but Tike all other contracts, and equally binds all the parties to it.
The contents or - obligations of a charter-party cannot be *163 varied by one of tbe parties to it, without the consent of the other -, nor by inferences or vague presumptions. Such is the daily ruling of this court. It is the law between the parties, and there is no power on earth, or should not be, to change it. Even the Quartermaster General is not invested with this right.
It is inferred that the price fixed by the first charter-party was ■excessive, and justified the Quartermaster General in refusing the money earned under that charter, because the same vessel was subsequently hired by the United States at a lower rate. This inference strikes me as unreasonable. The premises do not sustain the conclusion. The value of the vessel might have been reduced in many ways, perhaps by the very service for which the stipulated compensation is now refused. Competition may have been greater, or the changed condition of the country, as well of the vessel or of its owner, might furnish other and sufficient explanation to account for the reduction.
My observation indicates that the values of vessels and of their earnings fluctuate more than any other property. I might also add that the second and third charters, introduced as evidence by the United States, are improperly in the record, and should not be considered. Each charter has its own force and stipulations, and is alone the contract of the parties, for the time to which it relates. These later charters of course are not referred to in the first one, and cannot explain it. They are independent contracts which have no relation to each other. Such an inference, drawn from such facts, is an indication of the difficulty of adducing good reasons for the judgment rendered.
The same logic, if carried out, would show that the third charter-party of the same vessel, between the same parties, at a less rate of compensation than that fixed by the second, is also conclusive evidence of fraud or collusion or of excess of price in the second ; thereby furnishing cumulative evidence of the abuse suffered by the United States, in having voluntarily made what is now denominated a vicious bargain about this vessel.
I think that much of the matter which encumbers this record is not legal evidence. The letters of the Quartermaster General to his subordinates, giving instructions to them in relation to their duties, cannot be considered as binding on other par *164 ties, especially where there is no evidence that such parties were even cognizant of them.
They contained not public but private instructions, for the guidance of officers only, liable to be varied from day to day,, and might never be enforced. They had no application to any particular charter, and until the subordinate gave direct obedience to his instructions, by applying them to some particular person or instance, each individual might well, nay, had a right to suppose that he would be exempt from interference. Had he even inquired after or about such instructions, he probably would have been regarded as impertinent. The letters from one assistant quartermaster to another in reference to their transactions with a citizen cannot be used to affect his relations with the government to his j>rejudice. They may make very good history for the whole people, but do not make good evidence to bind one of them.
The charter-party in question gave the government the control of the vessel, and the option of holding or of discharging her at pleasure. If the United States did not think her services an equivalent for the price agreed to be paid, the proper and easy way of relieving them from so oppressive a burden was to do what the contract provided for, that is, discharge the vessel. As between individuals no other course would have been resorted to or thought of, unless resort was had to a new contract, in which both parties should again unite upon new terms. Instead of pursuing this course, a military order, dated December 19, 1863, was issued, directing that “ the rate of the vessel, if her services are required for a longer period, is deemed excessive and will be reduced from the 20th December, 1863.” This is the language of authority and command, which means with or without the consent of the owner. It will be observed that if her services were required for a longer 'period she toas not to be discharged. No direction was given to make a new hiring at a reduced rate, but her price must and will be reduced. This is the flat that was issued to and obeyed by the officer. There was no deference whatever observed as to the rights of the citizen.
It may be inquired why the claimant, on the first intimation that his pay was to be reduced or withheld, did not immediately apply to this court for relief? I cannot answer explicitly. *165 There may have been many reasons for the delay; he may not have been informed as to his rights in the premises. No matter what the reasons — these were for his own consideration. I can, however, suppose one reason that might have deterred him from adopting this line of conduct. Oar rules, supported by decisions, require the claimant first to apply to the department for redress before he can be permitted to bring his suit and have a hearing here. We compel him to appeal to the same Caesar who has done him the wrong he complains of, and he must then wait until Caesar relents and condescends to grant a gracious hearing, or take as an answer to his supplication there another denial, before he is permitted to take his first step in the way of a recovery here.
In this, as in all like cases of agreement, where the sovereign is one of the contracting parties, the citizen is not on a footing of equality. "
The government is stronger than any of its citizens. To resist is useless. There are many influences as well as prejudices which contribute to discourage the citizen in any efforts he may make to maintain a position against such odds as the government and circumstances oppose to him. This case, as I believe, illustrates the difficulty of applying to the court for redress. Implications and presumptions, except in occasional cases, rise to the dignity of evidence, and are applied on behalf of the sovereign against the citizen.
The highest function of the law is to protect the weak against the strong, and if it fails to furnish that protection when appealed to, and to sustain the individual in his rights against his government, it neglects its most imperative duty.
Losing, J., did not sit in the case and took no part in the decision.
Milligan, J., agreed in the opinion read by the Chief Justice.